# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CARL WHITEHEAD (M00110),

       Petitioner,

       v.

RICK HARRINGTON, Warden
Menard Correctional Center,

       Respondent.

Case No. 14-cv-4118

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Petitioner Carl Whitehead brings a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his convictions entered in the Circuit Court of Cook County. After a 2008 jury trial, Petitioner was convicted of the first-degree murder of Ramiro Aguirre, home invasion, residential burglary, and attempted armed robbery. He was sentenced to a term of natural life. For the following reasons, the Court denies the Petition, and declines to issue a certificate of appealability.

## I.    Background

### A. The Underlying Offense

Norma Calderon was asleep in her home in Chicago, Illinois in the early morning of November 22, 2005. [21-17] at 24, 28. Calderon, who was pregnant, shared the home with her husband, Ramiro Aguirre. *Id.* at 24, 26. That morning, Aguirre was in the couple's bedroom while Calderon slept in the nursery the couple built in anticipation of their child. *Id.* at 28–29.

Calderon awoke when she heard glass breaking and the home's security alarm beeping. *Id.* When she got up to investigate the sounds, she encountered a man who put a gun to her head and his hand over her mouth. *Id.* at 30. Shortly after, Aguirre emerged from the bedroom and, upon seeing his wife in danger, began to struggle with the intruder. *Id.* at 31. During the struggle, the gun fired into Aguirre's chest and he fell to the ground. *Id.* at 31–32. The intruder turned to Calderon and demanded that she tell him where she kept money in the house. *Id.* Calderon responded that she did not have any money in the house, and the man left. *Id.* at 32. Calderon called 911 and tended to her husband. *Id.* at 33. Aguirre died by the time emergency personnel arrived. *Id.*

## B. Petitioner's Trial

### 1. *Voir Dire*

During jury selection for the petitioner's criminal case, the Cook County Circuit Court conducted voir dire. [21-16] at 22. The court asked the jurors in groups of three if they understood that the defendant was presumed innocent, that the State must prove guilt beyond a reasonable doubt, and that the defendant had a right to remain silent and, should he not testify, his silence could not be held against him. *Id.* at 38. All jurors answered, "Yes." *Id.*

### 2. Marcus Griffin

At trial, the State called Marcus Griffin, who was also charged with first-degree murder in Aguirre's death. [21-20] at 200–01. Griffin took a plea deal in exchange for identifying Petitioner as the murderer. *Id.* at 203–04. While

testifying, however, Griffin denied taking part in the crime at Aguirre's home, meeting Petitioner there, and seeing Petitioner there with a gun. *Id.* at 207–09. Griffin also denied hearing gun shots at the home and seeing Petitioner leaving the residence. *Id.* at 213–14. Finally, Griffin denied that Petitioner threatened him and that he acted as a lookout while Petitioner robbed Aguirre's home. *Id.* at 214.

After Griffin testified, the State played a videotaped interview that Chicago Police conducted with Griffin in May 2006. [21-21] at 11. During the interview, Griffin told detectives that, shortly before the murder, there was a fire in the garage behind Aguirre's home. [21-15] at 107, 110. Griffin said he was watching the fire department extinguish the fire when an acquaintance, Sedale Miller, told Griffin that Calderon told firefighters that she kept a large sum of money in the garage. *Id.* at 110–12. Griffin told detectives that Miller and Petitioner planned to rob the home. *Id.* at 112–13.

During the interview, Griffin also reported that Miller later talked about Petitioner describing the murder. *Id.* at 127–28. Griffin further stated that he had sold drugs for Petitioner and had seen Petitioner beat up other people. *Id.* at 113–14, 121. Griffin told detectives that an acquaintance told him that Petitioner was responsible for an earlier shooting on Parkside Avenue. *Id.* at 121–22.

### 3. Tenisha Gibbs

In addition to Griffin, the State called Tenisha Gibbs. [21-18] at 5. Gibbs lived across the street from Aguirre and had been in a relationship with Petitioner before the murder. *Id.* at 12–13. The State asked whether she became pregnant

with Petitioner's child; Gibbs denied being pregnant. *Id.* The trial court sustained objections to the State's subsequent questions about whether Gibbs aborted the pregnancy and whether Petitioner paid for the abortion. *Id.* at 13–14. The State later revisited this issue and asked whether Gibbs remembered making statements regarding her pregnancy and abortion to the police. *Id.* at 19–21. Gibbs testified that her previous statements to police were untrue and coerced. *Id.* Petitioner's attorney did not object. *Id.*

The prosecution elicited testimony about the abortion twice more without Petitioner's attorney objecting. First, the State called Detective James Gigler, who testified that Gibbs told him during a police interview that she became pregnant with Petitioner's child and that Petitioner paid for an abortion. [21-20] at 97–98. Second, the State called Assistant State's Attorney (ASA) Donna Norton, who read a statement she took from Gibbs in 2006. *Id.* at 36–37. In the statement, Gibbs said she held a gun for Petitioner in the summer of 2005, and that Petitioner impregnated her and then paid for her to have an abortion. *Id.* at 40–42.

### 4. Parkside Shooting

Detective Gigler testified that police recovered a shell casing from the scene of Aguirre's murder that was tested by forensic science personnel. *Id.* at 65–66. The casing matched one taken from the scene of a 2004 shooting on Parkside Avenue in Chicago, Illinois (the Parkside shooting). *Id.* at 66–68. The State called various witnesses to testify about the Parkside shooting; the first was Erwin Marrero. [21-17] at 94. Marrero identified Petitioner as the man whom Marrero

got into a car accident with shortly before the Parkside shooting. *Id.* at 96. Marrero said that Petitioner sped away from the accident in a rage, but returned shortly after and shot at Marrero and Marrero's friend Eric Bowman, missing both men. *Id.* at 97–98. Marrero testified that Petitioner eventually shot Bowman in the hand. *Id.* at 100–02. On cross-examination, Marrero said he did not report his account of the shooting until police questioned him in 2006. *Id.* at 103–06.

The State then called Bowman, who echoed much of Marrero's testimony, but denied knowing who shot him. *Id.* at 110–24. Bowman testified during cross-examination that he originally did not want to report the shooting and only cooperated with police after they questioned him in 2006 about the incident. *Id.* at 131. The State also called ASA Peter Garbis, who in 2006 took Bowman's statement about the Parkside shooting. [21-20] at 8. Garbis read the statement aloud. *Id.* at 14. In the statement, Bowman said that he knew the man who shot him by the man's face and learned days later that it was Petitioner. *Id.* at 14–19.

### 5. Sleeping Juror

At trial, a juror was heard snoring during a witness's testimony. [21-19] at 24. Petitioner's attorney then told the court that he intended to move for a mistrial. *Id.* at 51. The court responded that it would not grant the motion because it believed the juror was awake for the rest of the proceedings. *Id.* After the jury instruction conference, the prosecution wanted to move to remove the juror because they had seen him sleeping at other points in the trial. [21-21] at 82. Petitioner's attorney argued that the juror should remain because he was the only African-

American juror and merely rested his eyes while listening. *Id.* at 83. The court then brought out the juror and asked him whether he was awake throughout the trial; the juror said he was. *Id.* at 84. The court let the juror remain. *Id.*

### 6. Closing Arguments

During closing arguments, the State described Calderon and Aguirre's life before the shooting, including how they prepared a nursery for their unborn child. *Id.* at 108. The State also argued that any claim that Petitioner was the victim of a police conspiracy was unreasonable, as it would have required an elaborate plot by many unrelated actors. *Id.* at 133–34. The court overruled Petitioner's objection to this argument. *Id.* at 134. The prosecution later argued that if the police were going to conspire against Petitioner, they would have done a better job by forcing more specific testimony from more reliable witnesses. *Id.* at 146.

During the defense's closing statement, Petitioner's counsel argued that the police's interrogation techniques were coercive. *Id.* at 118–19. Petitioner's counsel said that police "knock you down until they get where they need you to go." *Id.*

### C. Post-Trial and Post-Conviction Proceedings

### 1. Verdict, Sentencing, and Post-Trial Motion

The jury found Petitioner guilty of first-degree murder, home invasion, residential burglary, and attempted armed robbery. *Id.* at 180–81. Petitioner subsequently filed a motion for a new trial. [21-22] at 4. Petitioner alleged various instances of prosecutorial and court error, including: improperly using evidence relating to gang activity; admitting inadmissible hearsay about the garage fire and

improper prior consistent statements; improperly admitting evidence of the Parkside shooting; ineffective assistance of counsel for failing to excuse the sleeping juror; and improperly admitting testimony about Gibb's abortion. *Id.* at 17, 29, 43–44, 54. The trial court denied the motion and sentenced Petitioner to life imprisonment for the murder. *Id.* at 92, 118. The court also sentenced Petitioner to 30 years for home invasion, 15 years for burglary, 15 years for attempted armed robbery, and 25 years for discharging the firearm. *Id.* at 118.

### 2. Direct Appeal

On direct appeal, Petitioner argued about the admission of inappropriate evidence, specifically: (1) gang activity discussed in Griffin's videotaped interview; (2) Gibb's abortion; and (3) the Parkside shooting. [21-1] at 1. Petitioner also argued that: (4) the court did not follow proper *voir dire* procedures pursuant to Illinois Supreme Court Rule 431(b); (5) the State's closing argument was improper because it discussed the loved ones Aguirre left behind and falsely accused the defense of arguing that the State and police engaged in a conspiracy; (6) his trial counsel was ineffective for failing to object to prejudicial evidence or testimony; and (7) the trial court deprived Petitioner of his right to a fair trial by allowing the sleeping juror to remain and refusing to hold a post-trial hearing on Petitioner's affidavit asserting that he wanted the juror excused for error. [21-2] at 50–65.

The appellate court found that admitting the videotape was an "invited error" because the trial court admitted the tape based upon agreements between the parties, and defense counsel helped redact the tape. [21-1] at 12. The appellate

court held that, because defense counsel did not object to admitting the videotape, the issue was procedurally defaulted and could not be raised on appeal, though the court also noted that there was no obvious error in admitting the tape. *Id.*

The appellate court also held that testimony and evidence about Gibbs' abortion was relevant at trial because her previous statements about the abortion contradicted her trial testimony and thus related to her credibility. *Id.* at 14. The court found that the probative value of the abortion evidence outweighed any prejudice to Petitioner. *Id.* at 16.

As for the Parkside shooting, the appellate court held that the evidence about the shooting was not offered to show propensity, but only to link Petitioner to the previous shooting, and thus Aguirre's murder. *Id.* at 18–19. The court held that the probative value of the evidence outweighed any prejudicial effect. *Id.*

The appellate court also held that Petitioner's argument about *voir dire* lacked specificity and merit; regardless, the appellate court reviewed the record and found no error by the trial judge. *Id.* at 21. As for the sleeping juror, the appellate court held that, because Petitioner ultimately argued for the juror to remain, he could not later object to the "invited error." *Id.* The appellate court also held that there was no legal basis for Petitioner's argument that the trial court was required to consult with him directly on this issue. *Id.* at 25.

Addressing Petitioner's contentions that the State's closing arguments were improper, the appellate court held that the trial court did not err by allowing the State's emotional appeals about Calderon and Aguirre, because those appeals

reasonably interpreted what the murder victim's family might feel. *Id.* at 27. The appellate court also held that Petitioner invited the conspiracy argument by discussing police motives and alluding to a conspiracy. *Id.* at 27–28.

Finally, the appellate court applied the *Strickland v. Washington*, 466 U.S. 668 (1984), test to resolve Petitioner's numerous allegations that this trial counsel was ineffective. *Id.* at 28–29. The court held that the claims were either waived for lack of specificity or prejudice, or were a matter of trial strategy and thus lacked merit. *Id.* at 29–32.

Following the appellate court's ruling, Petitioner filed a Petition for Leave to Appeal (PLA) with the Illinois Supreme Court. [21-5] at 1. Petitioner argued that: (1) the abortion evidence was improperly admitted; (2) the trial court did not properly conduct *voir dire*; (3) trial counsel was ineffective for not objecting to Griffin's videotaped interview; (4) the sleeping juror denied Petitioner a fair trial and the court erred by not holding a post-trial hearing on Petitioner's affidavit that he wanted the juror excused for error; and (5) the State's arguments during closing statements were prejudicial and trial counsel was ineffective for failing to object. *Id.* at 3. The Illinois Supreme Court denied leave to appeal. [21-6].

### 3. Collateral Petition and Appeal

After his direct appeal, Petitioner filed a petition for post-conviction relief with the Cook County Circuit Court. [21-7] at 21. Petitioner alleged ineffective assistance of trial and appellate counsel for: (1) failing to object to improper hearsay, opinion, and character evidence; (2) participating in admitting and editing

Griffin's videotaped interview; (3) failing to object to improper impeachment evidence or request a limiting instruction regarding the evidence; and (4) failing to object to Bowman's testimony about gang activity. *Id.* Petitioner also alleged that his appellate counsel failed to raise the above issues and failed to raise a claim that the evidence against him was insufficient. *Id.* The Circuit Court dismissed the petition in the first stage. *Id.*

On appeal to the Illinois appellate court, Petitioner raised all the above issues again, and specified that the limiting instruction that defense counsel failed to give for the improper impeachment evidence should have been given when the State introduced impeachment evidence. *Id.* at 22–42. The appellate court held that: (1) Petitioner's claim about Griffin's videotape was barred by *res judicata* because he raised the claim on direct appeal, [21-10] at 16; (2) admitting grand jury testimony containing hearsay statements about Calderon's garage was justified and thus counsel was not ineffective for failing to object to that testimony, *id.* at 17–18; (3) Petitioner's claims regarding lack of character evidence were not supported by any authority and thus were forfeited, *id.* at 18; (4) the impeachment evidence was proper because the witnesses against whom it was used affirmatively harmed the State's case by contradicting their own previous statements, *id.* at 20–21; (5) the new qualification about the timing of the limiting instruction was barred because Petitioner did not raise that argument in his original collateral petition, *id.* at 21; (6) trial counsel did in fact object to gang evidence, during a sidebar when the State wanted to ask Bowman why he would not identify Petitioner as the Parkside

shooter, to which Bowman replied that he did not wish to become involved in gang-related issues, *id.* at 22; (7) Petitioner's other references to witnesses testifying to gang activity were not raised in his original collateral petition and thus were barred on appeal, *id.* at 22–23; and (8) appellate counsel was not ineffective for failing to raise every possible issue on appeal, and several issues that Petitioner alleged that appellate counsel failed to raise were meritless, as noted above, *id.* at 23.

Petitioner filed a PLA with the Illinois Supreme Court and raised the following issues: (1) the appellate court erred by holding that hearsay accounts of Calderon's statements were admissible, [21-11] at 10–11; (2) the appellate court did not properly apply the law of forfeiture, *id.* at 12–13; and (3) the appellate court did not correctly apply *res judicata*, *id.* at 13–14. The Illinois Supreme Court denied leave to appeal. [21-12].

### D. Petitioner's Federal Habeas Corpus Claims

In June 2014, Petitioner filed a federal habeas corpus petition with this Court, pursuant to 28 U.S.C. § 2254. Petitioner raised the following claims:

- **Claim A:** The trial court violated his due process rights by admitting the Griffin video because the video contained hearsay, evidence of gang affiliations, and evidence of other crimes. This evidence was prejudicial to Petitioner, and the court exacerbated the prejudicial effect by allowing the video to go to the jury room for deliberations.

  - **(1):** The State did not lay the proper foundation for admitting the video because Griffin was not asked whether the statements were true.

- **Claim B:** The trial court erred by allowing questions and testimony about Gibbs' abortion because abortion is a controversial subject. The information was not relevant and was highly prejudicial to Petitioner.

- **Claim C:** The trial court violated Petitioner's due process rights by admitting evidence on the Parkside shooting. The trial court told the jury that testimony about the unrelated shooting was only for identifying Petitioner as the Parkside shooter. Petitioner claims, however, that the Parkside testimony became a "trial within a trial" that went beyond mere identification and included evidence of criminal propensity.

- **Claim D:** The trial court failed to follow Illinois rules for *voir dire* because the court did not question jurors about the presumption of innocence or the state's burden of proof.

- **Claim E:** Allowing the sleeping juror to remain violated Petitioner's due process rights and his Sixth Amendment right to a jury trial. Petitioner claims that the trial court did not consult him directly about his wishes and that he told his attorney to ask the court to remove the juror.

- **Claim F:** In closing arguments, the prosecutor improperly referred to the family that the victim left behind and referenced Petitioner's "conspiracy" theory. The prosecution's statements about Aguirre's family were not relevant to Petitioner's guilt or innocence and were prejudicial to Petitioner, denying Petitioner a fair trial. Further, the prosecutor's claim during closing that the defense argued that witnesses engaged in a conspiracy against Petitioner was false; the defense never made that argument during the trial.

- **Claim G:** Trial counsel was ineffective for:

    - **(1)** Failing to object to the Griffin video;

    - **(2)** Failing to object to evidence about Gibbs' abortion;

    - **(3)** Failing to object to evidence of the Parkside shooting;

    - **(4)** Requesting that the sleeping juror remain in service;

    - **(5)** Failing to object to the State's inflammatory statements in closing arguments;

    - **(6)** Failing to object to testimony about Calderon's hearsay statement that there was money in her garage, which the State claimed provided Petitioner's motive for the robbery-turned-murder;

    - **(7)** Failing to object to grand jury testimony that Petitioner committed the murder;

- o **(8)** Failing to object to Miller's grand jury testimony that Petitioner was a "bad guy" whom he feared;

- o **(9)** Failing to object to impeachment with prior inconsistent statements and failing to request limiting instructions;

- o **(10)** Failing to object to the admission of gang evidence;

- o **(11)** Failing to object to the court's *voir dire* of potential jurors; and

- o **(12)** Failing to request a limiting instruction about the use of prior inconsistent statements as substantive evidence.

- **Claim H:** Appellate counsel was ineffective for:

  - o **(1)** Failing to challenge the sufficiency of the evidence;

  - o **(2)** Failing to more fully address the Griffin video; and

  - o **(3)** Failing to argue that trial counsel was ineffective for failing to object to admitting gang evidence through Bowman's testimony.

## II.  Legal Standard

Federal review of state court decisions under 28 U.S.C. § 2254 is limited.  A federal court can grant habeas relief only if the challenged state court decision is "contrary to" or "an unreasonable application of" clearly established federal law, as established by the United States Supreme Court, or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1)-(2); *see also Harrington v. Richter*, 562 U.S. 86, 100 (2011).  This Court presumes that the state court's account of the facts is correct, and Petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1); *see also Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012).

A petitioner's claim is procedurally defaulted if the petitioner did not raise the claim in the state courts, and thus failed to give the state courts "one full opportunity" to resolve any constitutional issues. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). If a claim is procedurally defaulted, a federal court may review it and reach a decision on the merits only if "the petitioner demonstrates cause and prejudice or a fundamental miscarriage of justice if the claims are ignored." *Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010).

## III. Discussion

### 1. Claims A, A(1), C, G(2)–(4), G(6), G(9)–(12), and H(1)–(3)

Petitioner's claims are procedurally defaulted if he did not give the state courts "one full opportunity" to resolve any constitutional issues by "invoking one complete round of the State's established appellate review process." *Boerckel*, 526 U.S. at 845. Petitioner, moreover, must present each factual basis for an ineffective assistance of counsel claim to the state courts to avoid default. *Stevens v. McBride*, 489 F.3d 883, 893–94 (7th Cir. 2007).

### a) Claims A and A(1)

Petitioner argues that admitting the Griffin video violated his due process rights because the video contained hearsay, evidence of gang affiliations, and evidence of other crimes. Petitioner also argues that the State did not lay the proper foundation for admitting the video.

Petitioner did not raise Claim A in his direct appeal PLA and did not raise Claim A1 in his direct appeal or direct appeal PLA. In his reply, Petitioner

contends that he sufficiently presented the claims by arguing in his direct appeal PLA that his trial counsel was ineffective for failing to object to admitting the video. [35] at 6–7. For support, Petitioner cites his PLA brief, which argued that admitting the video was prejudicial, based upon *People v. Patterson*, 154 Ill. 2d 414 (Ill. 1992). *Id.*

Arguments presented for the first time in a reply are waived. *Wilson v. Giesen*, 956 F.2d 738, 741 (7th Cir. 1992). Were the Court to address these claims, it would still find that the claims are procedurally defaulted. The arguments Petitioner cites in his PLA relate to his contention that he received ineffective assistance of counsel, not that admitting the video otherwise deprived him of a fair trial. Petitioner has, as a practical matter, cited arguments supporting a claim in his PLA and asserted that those arguments are themselves a claim that he presented in the PLA. But "an assertion that one's counsel was ineffective for failing to pursue particular constitutional issues is a claim separate and independent of those issues." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). Even though Petitioner made allusions in the PLA that now form the basis of Claim A, the state courts were still not "given the opportunity to address the underlying issue." *Id.*

Petitioner cites *Dye v. Hofbauer,* which holds that a court may look to the parties' state court briefs to determine which arguments were presented in post-conviction appeals. 564 U.S. 1, 3–4 (2005). In *Dye,* the Supreme Court reversed the district court's holding that a claim of prosecutorial misconduct was procedurally

defaulted; the Court found that, in a state court brief, the petitioner cited the Fifth and Fourteenth Amendments in the relevant heading and cited cases about the deprivation of constitutional rights due to prosecutorial misconduct. *Id.* at 4. Thus, the petitioner sufficiently presented the issue to avoid default. *Id.*

*Dye* does not help Petitioner; the relevant heading in his brief only addresses ineffective assistance of counsel. [21-5] at 8. Also, *People v. Patterson,* which the relevant part of the PLA brief cites, does not clearly support either the claim in the PLA or the claim which Petitioner now brings. *Id.* at 9. The brief fails to articulate how *Patterson* supports the claim of ineffective assistance of counsel. *Id.* Further, *Dye* is distinguishable from this case because the procedural default here stems from Petitioner failing to present the claim itself, instead of failing to present the proper basis for the claim. This Court cannot find that Petitioner's brief gave the state courts adequate opportunity to be aware of the claim and address it. There is no authority supporting the idea that an underlying argument for a claim in Petitioner's PLA was itself a separate claim that he sufficiently presented to the Illinois courts.

Petitioner further argues that, because he relied on state cases concerning the constitutional rights underlying Claim A and asserted the claim to invoke those rights, he did not default the claim. [35] at 7. But the case upon which he relies, *White v. Lamas*, 905 F. Supp. 2d 624 (E.D. Pa. 2012), is inapposite. *White* addressed a different issue: namely, whether a petitioner sufficiently presented a

constitutional basis for a claim to the state courts. 905 F. Supp. 2d at 636–37. That is a different question than whether the petitioner raised the claim at all.

Because neither Claim A nor Claim A1 was sufficiently raised at all three levels of the Illinois court system, those claims are procedurally defaulted. This Court therefore cannot review those claims unless Petitioner shows "cause and prejudice" for the default or a "fundamental miscarriage of justice." *Byers*, 610 F.3d at 985. Petitioner does not attempt to show cause or prejudice, nor does he argue that a default would result in a fundamental miscarriage of justice; and even if he had attempted to do so, the record would not support such claims on the merits. Thus, Claims A and A1 are procedurally defaulted.

### b) Claim C

Petitioner argues that admitting testimony and evidence about the Parkside shooting denied him due process. Petitioner contends that, by admitting such evidence, the trial court allowed a "trial within a trial" that exceeded the original purpose of the testimony—linking Petitioner to the murder weapon.

Petitioner did not raise Claim C in his PLA. Petitioner notes in his reply, however, that in his PLA brief, under a claim of ineffective assistance of counsel, he quotes a line from the Griffin video, wherein Griffin says that Petitioner once shot someone. [35] at 7–8. Petitioner argues that this quote from the video, in conjunction with a reference later in the brief to an Illinois state case discussing constitutional protections, constitutes a sufficient presentment of Claim C in the PLA. *Id.* This Court disagrees. Arguments presented for the first time in a reply

are waived. *Wilson*, 956 F.2d at 741. Even if this Court were to address the claim's substance, it would still find that Claim C is both meritless and procedurally defaulted.

Making a claim for ineffective assistance of counsel does not qualify as sufficiently presenting the underlying issue that the attorney failed to raise. *Lewis*, 390 F.3d at 1026. Moreover, Petitioner's argument is that admitting a variety of prejudicial evidence about the Parkside shooting deprived him of a fair trial. Petitioner points to allegedly improper evidence that went beyond the purpose of identifying Petitioner as the Parkside shooter, and tries to rely on the totality of this evidence to prove prejudice. Petitioner does not explain, however, how the single Griffin quote, which only identified the shooter, gave the state court sufficient notice of a claim that relies upon a series of statements throughout Petitioner's trial by different witnesses. This Court cannot see how the state courts had an opportunity to review Claim C.

Because Claim C was not sufficiently raised at all three levels of the Illinois court system, this claim is procedurally defaulted. This Court, therefore, cannot review Claim C unless Petitioner shows "cause and prejudice" for the default or a "fundamental miscarriage of justice." *Byers*, 610 F.3d at 985. Petitioner does not attempt to show cause or prejudice, nor does he argue that a default would result in a fundamental miscarriage of justice. Accordingly, Claim C is defaulted.

### c) Claims G(2)–(4)

Petitioner argues that his trial counsel was ineffective for: (1) failing to object

to evidence regarding Gibbs' abortion (G(2)); (2) failing to object to evidence of the Parkside shooting (G(3)); and (3) requesting that a sleeping juror remain in service (G(4)).  Petitioner did not explicitly raise any of these claims in the PLA, but Petitioner maintains that he fairly presented the claims to the Illinois courts because, in the PLA, he argued that the abortion testimony and the sleeping juror deprived him of his constitutional rights; Petitioner also notes that the Griffin video contained a quote about the Parkside shooting.  [35] at 8–10.  Here again, however, a claim for ineffective assistance of counsel (for failing to raise a constitutional issue) is distinct from the underlying constitutional issue.  *Lewis*, 390 F.3d at 1026.  Thus, the claims Petitioner cites from his PLA did not give the state court "the opportunity to address" Petitioner's claims that his trial counsel was ineffective.  *Id.*

Petitioner argues that the state court's page limit on PLA briefs is cause for excusing the defaults on claims G(2)–(4).  [35] at 9–10.  Petitioner contends that his counsel could not raise the claims in the PLA because of the page limit, which "rendered futile any effort to obtain relief."  *Id.* (citing *Duckworth v. Serrano*, 454 U.S. 1, 10 (1981)).  But the page limit is a "reasonable and consistently applied state rule," and it would be "nonsensical" to hold that the page limit "could constitute cause for failure to adhere to another state procedural rule that deems issues not briefed on direct appeal to be waived."  *Weeks v. Angelone*, 176 F.3d 249, 272 (4th Cir. 1999).  Thus, the page limit did not render "the corrective process so clearly deficient," *Duckworth*, 454 U.S. at 10, that Petitioner has shown cause to excuse the default.  Petitioner did not argue that the default of Claims G(2)–(4) should be

excused for "cause and prejudice," or that there would be a "fundamental miscarriage of justice." *Byers*, 610 F.3d at 985. Claims G(2)–(4) are procedurally defaulted.

### d) Claim G(11)

Petitioner argues that his trial counsel was ineffective for failing to object to the trial court's *voir dire* of potential jurors. Petitioner did not raise this claim in the direct appeal PLA. Petitioner's claims are procedurally defaulted if he did not give the state courts a full opportunity to resolve any constitutional issues through the established review process. *Boerckel*, 526 U.S. at 845.

Petitioner contends that he avoids default on this claim because the state court procedure was deficient due to the page limit on briefs. [35] at 11. Petitioner argues that the page limit constitutes cause to excuse procedural default. *Id.* at 12. But as noted above, the page limit is a "reasonable and consistently applied state rule", and it would be "nonsensical" to hold that the page limit "could constitute cause for failure to adhere to another state procedural rule that deems issues not briefed on direct appeal to be waived." *Weeks*, 176 F.3d at 272. Thus, the page limit did not render "the corrective process so clearly deficient," *Duckworth*, 454 U.S. at 10, that Petitioner has shown cause to excuse the default.

Petitioner did not argue that the default of Claim G(11) should be excused for "cause and prejudice," or to avoid a "fundamental miscarriage of justice." *Byers*, 610 F.3d at 985. Thus, the Court may not review this claim on its merits. Claim G(11) is procedurally defaulted.

### e)  Claims G(6), G(9), G(10), G(12), and H(1)-(3)

Petitioner alleges that his trial counsel was ineffective for: (1) failing to object to hearsay statements about Calderon keeping money in her garage (G(6)); (2) failing to object to impeachment with prior inconsistent statements containing hearsay and failing to request limiting instructions regarding the same (G(9)); (3) failing to object to the admission of gang evidence (G(10)); and (4) failing to request a limiting instruction about using prior inconsistent statements as substantive evidence (G(12)).  Petitioner also claims that appellate counsel was ineffective for: (1) failing to challenge the sufficiency of the evidence against him (H(1)); (2) failing to more fully address the Griffin video (H(2)); and (3) failing to argue that trial counsel was ineffective for not objecting to admitting gang evidence through Bowman's testimony (H(3)).

Petitioner did not raise Claims G(6), (9), (10), or (12) in the direct appeal PLA, and did not raise Claims H(1)–(3) in the collateral PLA.  Petitioner argued in his PLA that the state courts misapplied hearsay rules, but the claims that Petitioner raises here are distinct from that hearsay claim.  *See Lewis*, 390 F.3d at 1026.  Accordingly, Claims G(6), (9), (10), and (12), and Claims H(1)–(3) are procedurally defaulted because they were not raised before all state courts.

Petitioner argues in his reply that those claims are not defaulted because his appellate counsel made an unreasonable decision not to raise them.  [35] at 12.  Arguments presented for the first time in a reply are waived.  *Wilson*, 956 F.2d at

741. Even if this Court were to reach a resolution on the merits, it would find that Petitioner's claims are unavailing and procedurally defaulted.

Petitioner argues that this Court should excuse his defaults because his appellate counsel was ineffective and did not correctly cite authority supporting the claims, which led the Illinois appellate court to deny the claims. Petitioner cites the exception that the Supreme Court articulated in *Martinez v. Ryan*, 566 U.S. 1, 12–16 (2012). [35] at 12. In *Martinez*, the Court held that an attorney's negligence in collateral proceedings might constitute cause to excuse procedural default provided the state collateral review proceeding was the first opportunity to raise an ineffective assistance of counsel claim. *Martinez*, 566 U.S. at 15–16.

Notwithstanding *Martinez*, ineffective appellate counsel cannot typically excuse procedural default. *Coleman v. Thompson*, 501 U.S. 722, 753–54 (1991). Also, *Martinez* is distinguishable because the Court there found that post-conviction counsel conceded that the petitioner "lacked any meritorious claim." *Martinez*, 566 U.S. at 18. In contrast, counsel on both Petitioner's direct and collateral appeals here raised a variety of claims before each state court. *See, e.g.*, [21-2]; [21-5]; [21-11]. Besides, *Martinez*'s narrow exception does not apply for federal habeas petitions filed by Illinois prisoners, because in Illinois, collateral proceedings are *not* a petitioner's first opportunity to raise an ineffective assistance of counsel claim. *See Murphy v. Atchison*, No. 12-3106, 2013 WL 4495652, at *22 (N.D. Ill. Aug. 19, 2013) (collecting cases). Under Illinois law, when an ineffective assistance

of trial counsel claim is based on the trial record, the claim is waived unless brought on direct appeal. *People v. Smith*, 745 N.E.2d 1194, 1201 (Ill. 2000).

Here, in claims G(6), (9), (10), and (12), Petitioner argues that his trial counsel should have objected to various pieces of evidence that were admitted at trial and should have requested limiting instructions on that evidence. As such, Petitioner's ineffective assistance claim arises from the trial record itself, and thus, it could have been brought on direct appeal. *Smith*, 745 N.E.2d at 1201. Further, both direct and collateral appellate counsel raised numerous issues that the state court evaluated on the merits, so this case does not fall within *Martinez*'s narrow exception. Thus, Claims G(6), (9), (10), and (12), and Claims H(1)–(3) are procedurally defaulted.

### 2. Claim G(7)–(8)

A claim is procedurally defaulted when "a state court declined to address a prisoner's federal claims because the prisoner failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 730. In these instances, "the state judgment rests on independent and adequate state procedural grounds." *Id.* Illinois' forfeiture rule is an independent and adequate state law ground in the context of federal habeas review. *Kaczmarek v. Rednour*, 627 F.3d 586, 592 (7th Cir. 2010).

Petitioner argues that trial counsel was ineffective for failing to object to admitting grand jury testimony that an individual believed that Petitioner committed the murder, and admitting Miller's grand jury testimony that Petitioner was a "bad guy" whom Miller feared. During his state appeal, Petitioner did not

cite authority to support those claims. The state courts rejected those claims under Illinois' forfeiture law, which requires that a petitioner cite authority to support a claim. [21-10] at 18. Thus, because Illinois' forfeiture rule is an independent and adequate state ground that supports the state judgments, Claims G(7) and (8) are procedurally defaulted. *See Harris v. Reed*, 489 U.S. 255, 260–62 (1989).

### 3. Claim B

Petitioner alleges that the trial court erred by allowing questions and testimony about Gibbs' abortion because abortion is highly controversial. Petitioner may receive habeas relief if the state court's decision is either "contrary to" or "an unreasonable application of" clearly established federal law, as determined by the United States Supreme Court. § 2254(d)(1); *Avila v. Richardson*, 751 F.3d 534, 536 (7th Cir. 2014) (citing *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

Respondent argues that Claim B has no basis in federal law—and therefore is not cognizable under federal habeas review—because Petitioner framed the issue as a matter of state evidentiary law. [20] at 16–17. Petitioner's framing is not determinative, however, because a habeas petition filed by a pro se petitioner is "entitled to a liberal construction." *Perruquet v. Briley*, 390 F.3d 505, 512 (7th Cir. 2004). In his Petition, Petitioner alludes to his Sixth Amendment rights by arguing that the evidence of Gibbs' abortion deprived him of a fair trial. [1] at 18. Applying *Perruquet's* liberal standard, this Court finds that Claim B is a potentially cognizable under federal habeas review because Petitioner argues that the evidence of abortion denied him a constitutional right.

Turning to the substance of Claim B, a trial court's decision to admit evidence generally does "not implicate federal constitutional rights," *Perruquet*, 390 F.3d at 510, and is therefore not reviewable by this Court under § 2254(d)(1). Petitioner would have to show that the decision was "contrary to" or "an unreasonable application of" clearly established federal law for this Court to review Claim B on the merits. § 2254(d)(1); *Avila,* 751 F.3d at 536. Moreover, the state court must have committed "an error so serious as to render it likely that an innocent person was convicted" for this Court to find that Petitioner was deprived of due process. *Perruquet*, 390 F.3d at 510. Petition fails to make such a showing here.

Petitioner cites no authority holding that admitting evidence on abortion (or any controversial issue) automatically deprives a defendant of a fair trial under federal law. As for admitting allegedly prejudicial evidence, a defendant's right to a fair trial is compromised only when the probative value of the evidence "is *greatly* outweighed by the prejudice to the accused from its admission." *Woodruff v. Lane*, 818 F.2d 1369, 1373 (7th Cir. 1987). And the mere fact that admitted evidence "shocks the conscience" does not alone violate due process. *United States ex rel. Gonzalez v. Detella*, 918 F. Supp. 1214, 1221 (N.D. Ill. 1996). Even when evidence was used to "inflame the jury" against the defendant, courts have denied habeas relief when the resulting prejudice did not create a significant chance that the state court convicted an innocent person. *Id.* at 1221.

Even though abortion remains a controversial issue, Gibbs' previous statements served a probative purpose because they undermined her credibility and

the admission of the evidence was not error, much less constitutional error. Also, the trial record contains significant evidence of Petitioner's guilt, so this Court cannot find that admitting the controversial evidence, even assuming that the admission was an error, was "an error so serious as to render it likely that an innocent person was convicted." *Perruquet*, 390 F.3d at 510. Thus, admitting the controversial evidence did not deprive Petitioner of due process, nor was the admission "contrary to" or "an unreasonable application of" clearly established federal law. Accordingly, Claim B is denied.

### 4. Claim D

Petitioner argues that he was denied the right to a fair trial because the trial court did not comply with Illinois Supreme Court Rule 431(b). [1] at 6. Rule 431(b) requires courts to ask potential jurors whether they accept the presumption of the defendant's innocence and the State's burden of proof. *People v. Zehr*, 469 N.E.2d 1062 (Ill. 1984). Petitioner may only obtain federal habeas relief if the state court's error concerned issues of federal law. § 2254(d)(1); *Avila,* 751 F.3d at 536. Petitioner does not connect Claim D to any issue of federal law or use language that could broadly be construed to concern federal law. Thus, Claim D is not cognizable in federal habeas review.

Petitioner argues in his reply that the claims are cognizable under federal law because Rule 431(b) is identical to federal law. [35] at 19. Arguments presented for the first time in a reply are waived. *Wilson*, 956 F.2d at 741. Even if this Court were to reach a resolution on the merits, it would hold that the state

court's ruling was not "contrary to" or "an unreasonable application of" clearly established federal law.

To obtain habeas relief, Petitioner must prove that the state court's decision was "contrary to," or "an unreasonable application of," clearly established federal law. § 2254(d)(1). The federal rule most closely related to Rule 431(b) is Federal Rule of Criminal Procedure 24(a), which concerns a trial court examining jurors. Rule 24(a) does not require the court to ask prospective jurors any questions about the presumption of innocence or the prosecution's burden of proof. Regardless, the record reflects that the state trial court, in fact, asked the jurors in groups of three whether they understood that the defendant is presumed innocent, that the state must prove guilt beyond a reasonable doubt, and that the defendant has a right to remain silent and, should he not testify, his silence cannot be held against him. [21-16] at 38. Quite simply, Petitioner misrepresents the record by alleging that the trial court did not question the jury about the state's burden of proof or the presumption of his innocence. Accordingly, the state court's decision was not "contrary to," or "an unreasonable application of," clearly established federal law; the state court also clearly complied with Illinois state law as well. Claim D is denied.

### 5. Claim E

Petitioner alleges that the trial court's decision not to hold a hearing on Petitioner's post-trial objection to the court's failure to remove a sleeping juror violated his constitutional rights to a fair trial and due process. Once again, federal

habeas relief is available only when the state court's decision is "contrary to," or "an unreasonable application of," clearly established federal law, as determined by the United States Supreme Court. § 2254(d)(1); *Avila*, 751 F.3d at 536. "Clearly established federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 583 U.S. 63, 71–72 (2003). If there exists no guidance from the Supreme Court on a claim raised in federal habeas review, this Court cannot find that a state court's decision was "contrary to," or "an unreasonable application of," clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 78 (2006).

In his Petition, Petitioner does not cite any Supreme Court decision that addresses the issue of a state court failing to remove a sleeping juror. Because there is no Supreme Court precedent for Claim E, this Court cannot find that the state court's decision was "contrary to," or "an unreasonable application of," clearly established federal law.

In his reply, Petitioner addresses the lack of Supreme Court precedent by citing *Jordan v. Massachusetts*, 225 U.S. 167, 176 (1912) (finding that a defendant has a right to an impartial and mentally competent jury), and an Illinois case which held that failing to remove a sleeping juror resulted in a deprivation of a defendant's Sixth and Fourteenth Amendment rights. [35] at 21–22. State cases are not federal law, and *Jordan* concerns a juror's mental capacity, not a sleeping juror. 225 U.S. at 176. Besides, arguments presented for the first time in a reply

are waived. *Wilson*, 956 F.2d at 741. Thus, this Court cannot reach the merits of the arguments first raised in Petitioner's reply.

Even if this Court were to address Petitioner's arguments on the merits, however, it would find that the state court's decision to allow the sleeping juror to remain did not violate Petitioner's constitutional rights. In the Seventh Circuit, a sleeping juror deprives a defendant of his constitutional rights only when the sleeping was so extensive that it rendered the juror incapable of performing his duties. *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000). Further, the Illinois case that Petitioner cites arrived at a similar holding; that court held that a defendant was deprived of his right to a fair trial only because a juror was asleep for most of the trial. *People v. Jones*, 861 N.E.2d 276, 279–80 (Ill. App. Ct. 2006).

In contrast, Petitioner's trial court determined that the juror otherwise stayed awake after the snoring incident to which defense counsel objected. [21-19] at 51. The trial judge specifically asked the juror in question if he was awake through the trial, and the juror answered that he was. [21-21] at 84. There is no evidence in the record that establishes that the juror was incapable of performing his duties or that his presence on the jury otherwise deprived Petitioner of his right to a fair trial and due process. In fact, Petitioner specifically requested that the juror remain on the case after the trial court's inquiry. Thus, Claim E would also fail on the merits if properly presented here.

### 6. Claim F

Petitioner alleges multiple problems stemming from the State's closing argument at his trial. Petitioner argues that the prosecution's statements about the victim's family deprived him of a fair trial because they were irrelevant and prejudicial. Petitioner also argues that the prosecution's statements alleging that defense counsel argued that state witnesses had conspired against Petitioner were prejudicial and not invited by arguments that defense counsel asserted.

*Darden v. Wainwright* sets forth the controlling federal analysis regarding a prosecutor's allegedly improper statements during closing argument. 477 U.S. 168 (1986). Under *Darden*, the court must first consider whether the prosecutor's comments were actually improper. *Ellison v. Acevedo,* 593 F.3d 625, 635–36 (7th Cir. 2010). If the comments were improper, the court must then consider: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." *Id.* at 646 (quoting *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000)). To determine whether the remarks were prejudicial, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned"; the question is "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (citation and internal quotation marks omitted).

Petitioner concedes in his reply that the state court applied the correct legal standard, but he contends that the state court's decision was an unreasonable application of the law to the facts. [35] at 26–27. Regarding statements the prosecution made about the victim's family, the state appellate court found that the prosecution made only two comments in its closing arguments. [21-1] at 25–26. First, the prosecution spoke of the optimistic life the victim and his wife had as they planned for the arrival of their unborn child. *Id.* Later, the State told the jury that Calderon went from being an "expectant mother with every reason in the world to be optimistic about her baby's future to a widow in the flash of a second by a gun fired by the defendant." *Id.* at 26. The state court determined that these statements were fair reflections of the evidence, were not made to engender sympathy beyond the facts of the case, and were not hyperbole. *Id.* at 26–27. The state court did not cite *Darden* or other precedent for that determination, but "if neither the reasoning nor the result of the state-court decision contradicts" federal law, then the decision is not contrary to federal law. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

The record supports the state court's findings on this question. Only two statements in the prosecution's closing argument contained sympathetic appeals to the victim's family, and Petitioner cites no other relevant portions of the record. Although the comments likely personalized the crime's devastating effect on the victim's family, the State may speak harshly about the defendant's conduct if the evidence supports harsh statements. *United States v. Durham*, 211 F.3d 437, 440

(7th Cir. 2000). Here, the victim's wife was pregnant and the couple had built a nursery for their child. Describing the abrupt loss that Calderon experienced when her husband—the father of her unborn child—was murdered is a reasonable interpretation of the facts of the case. The prosecution's statements, through dramatic and damaging to Petitioner, were supported by the evidence. Thus, the statements were not improper and the state court did not unreasonably apply federal law by allowing those statements.

Petitioner also notes repeated statements by the prosecution in rebuttal, arguing that Petitioner contended that he was the victim of a state conspiracy. The state appellate court agreed that the record contained repeated statements by the prosecution on this subject. [21-1] at 26. The court determined that the statements were not improper, because they were invited by defense counsel's closing argument. *Id.* Defense counsel repeatedly referred to witness testimony that police tried to "get" Petitioner, and also said: "The point is, they're all full of b.s. . . . The police got them where they wanted them, and they got what they want." *Id.* The appellate court noted the final remarks of defense counsel's closing statement: "Keep the presumption of innocence. Get [defendant]. That's what the police said. You heard that. Don't get him ladies and gentlemen." *Id.* at 27.

The prosecution's statements in closing argument cannot be improper if the statements were in response to remarks made in the defense's closing. *United States v. Severson*, 3 F.3d 1005, 1014 (7th Cir. 1993). *Severson's* safe harbor applies here. Defense counsel explicitly referred to an allegedly preconceived, concerted

effort by police and the State to arrest and convict Petitioner for the crime, with or without evidence. Thus, the State's discussion of defense counsel's conspiracy theory was not improper. *Id.* at 1014. Therefore, Claim F fails on the merits.

### 7. Claim G1

Petitioner argues that his trial counsel was ineffective for failing to object to the court admitting Griffin's videotaped statements. The video contained statements by Griffin concerning other alleged criminal activities, gang affiliations, accounts by Griffin's acquaintances of crimes that Petitioner allegedly committed, and Petitioner's alleged plan to rob Calderon's residence after hearing Calderon say she kept money in her garage. [21-15] at 112–17.

*Strickland* governs claims for ineffective assistance of counsel. 466 U.S. 668 (1984). Under *Strickland,* a petitioner must show that trial counsel "fell below an objective standard of reasonableness" and that counsel's error prejudiced the defendant such that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. This Court must find "clear error" to hold that the state court's application of *Strickland* was unreasonable. *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009). Finally, there is a "strong presumption" that "the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

Here, the state appellate court correctly articulated the *Strickland* standard, [21-1] at 28–29, so its decision was not "contrary to" clearly established federal law.

*See Price v. Vincent*, 583 U.S. 634, 640 (2003). This Court must next determine whether the state court's application of *Strickland* was unreasonable. It was not.

Here, the state appellate court determined that Petitioner's claim failed because defense counsel helped the state edit the tape for publishing. [21-1] at 29. The court also found that a defense attorney's decision not to file a motion in limine objecting to the admission of the tape was a strategic decision. *Id.* at 29–30. Finally, the court found that an objection would not have changed the outcome. *Id.* at 30.

This Court agrees with the appellate court's findings. Defense counsel participated in editing the video, which contained statements that the defense counsel wished to present along with the evidence Petitioner complains of. In light of these facts, Petitioner cannot overcome the "strong presumption" that the challenged conduct was sound trial strategy. *Strickland*, 466 U.S. at 689, *see also Walker v. Litscher*, 421 F.3d 549, 558 (7th Cir. 2005) (trial counsel is presumed effective and petitioners bear a "heavy burden" in proving ineffective counsel).

Further, even if counsel acted unreasonably, Petitioner has not shown that the state court unreasonably applied *Strickland* when determining that there was no prejudicial effect. The video likely would have been admitted over an objection, as it contained relevant statements to police by an important witness who contradicted those previous statements during testimony. The appellate court's application of federal law was therefore reasonable; Claim G1 fails on the merits.

### 8. Claim G(5)

Petitioner argues that trial counsel was ineffective for failing to object to the prosecution's statements in closing arguments (statements detailed in Claim F). To prove that his trial counsel was ineffective, Petitioner must show that his trial counsel's conduct was objectively unreasonable, and that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

This Court finds that the state appellate court appropriately applied *Strickland* to the facts. The appellate court found that the prosecution's statements were reasonable and that the absence of an objection was sound trial strategy, as the trial court likely would have overruled an objection. [21-1] at 31–32. As noted in sub-section E, this Court also finds that the prosecution's comments were proper, because they were reasonable interpretations of the evidence and defense counsel's closing arguments invited the prosecution's statements about Petitioner's alleged conspiracy theory. Thus, failing to object to these statements was an acceptable trial strategy. The appellate court thereby reasonably applied *Strickland*, and in any case, defense counsel's relevant conduct would not have changed the outcome. Claim G(5) therefore fails on the merits.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), a "certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." An applicant has made a "substantial showing" when "reasonable jurists

could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Resendez v. Knight*, 653 F.3d 445, 446–47 (7th Cir. 2011) (citations and internal quotation marks omitted). Here, this Court concludes that Petitioner has not made a substantial showing that he was denied a constitutional right, nor has he shown that reasonable jurists would debate the resolution of his claims. Accordingly, the Court declines to issue a certificate of appealability.

## V.    Conclusion

The Petition for a Writ of Habeas Corpus is denied, and the Court declines to issues a certificate of appealability. The Clerk is directed to enter a Rule 58 Judgment in favor of Respondent and against Petitioner. Civil case terminated.

Dated: October 19, 2017

Entered:

John Robert Blakey
United States District Judge